DHF LAW, P.C.
Devin H. Fok (SBN 256599)
devin@devinfoklaw.com
Joshua Kim (SBN 257260)
joshua@devinfoklaw.com
556 N. Diamond Bar Blvd, Suite 304
Diamond Bar, CA 91765
Telephone: 888.651.6411
Facsimile: 888.484.2023

Attorneys for Plaintiff
TOBY JOEL WILLIAMS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

TOBY JOEL WILLIAMS,

Plaintiff,

vs.

DISA GLOBAL SOLUTIONS, INC.; SCHULTZ INDUSTRIAL SERVICES, INC.; HEALTH & SAFETY COUNCIL; and DOES 1 TO 10, Inclusive,

Defendants.

Case No. 4:25-cv-06678-AMO

*Assigned to the Hon. Araceli Martínez-Olguín*

**PLAINTIFF'S RESPONSE TO SCHULTZ INDUSTRIAL SERVICES, INC.'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT**

Hearing Date: October 15, 2026
Time: 2:00 p.m.
Location: Courtroom 5, 2nd Floor
1301 Clay Street, Oakland, CA 94612

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

LEGAL STANDARD .......... 4

ARGUMENT .......... 5

A. Williams Sufficiently Alleged Concrete Injuries to Establish Article III Standing. .......... 5

1. Schultz misstates Williams' Article III injuries. .......... 5

2. Loss of an opportunity to timely dispute his "inactive" status with DISA and/or HASC is a concrete injury. .......... 7

3. Williams' allegations about injury to his employment interest satisfy the evidentiary burden at the pleading stage. .......... 9

B. The "Inactive" Status Is A Consumer Report. .......... 12

1. "Inactive" status means Williams has a negative drug test history. .......... 13

2. The "inactive" status report does not contain any information about transactions or experiences between Williams and DISA. .......... 16

C. Schultz's Disregard Of The Near-Certain Possibility Of Violating The Law Is Willful. .......... 20

D. "Inactive" Status Is An Investigative Consumer Report That Also Requires Notice Under ICRAA. .......... 23

E. Schultz's Request for Judicial Notice Must Be Denied .......... 24

CONCLUSION .......... 25

CERTIFICATE OF SERVICE .......... 27

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Intuit Inc.*,
No. CV 25-7280 PA (PDX), 2026 WL 1459671 (C.D. Cal. May 21, 2026)....22

*Am. Encore v. Fontes*, 152 F.4th 1097 (9th Cir. 2025)....9

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)....4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....11

*Beltran v. Waste Mgmt., Inc.*,
No. 2:23-CV-00279-DC-CSK, 2025 WL 1455680 (E.D. Cal. May 21, 2025)....22

*Berk v. Choy*, 607 U.S. 187 (2026)....11

*Campbell v. Adecco USA, Inc.*,
No. 2:16-CV-04059-NKL, 2017 WL 1476152 (W.D. Mo. Apr. 24, 2017)....5

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), *as revised* (May 24, 2016)....7

*Concha v. London*, 62 F.3d 1493 (9th Cir. 1995)....4

*Connor v. First Student, Inc.*, 5 Cal. 5th 1026 (2018)....23, 24

*Dawson v. Wonderful Pistachios & Almonds*, LLC,
No. CV 18-801 PA (JPRX), 2018 WL 5263063 (C.D. Cal. Apr. 27, 2018)....22

*Dutta v. State Farm Mut. Auto. Ins*. Co., 895 F.3d 1166 (9th Cir. 2018)....1, 7, 8, 11

*Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289 (2022)....9

*Flores v. Missouri Higher Educ. Auth.*,
No. 1:25-CV-940-JLT-EGC, 2026 WL 1622878, (E.D. Cal. June 5, 2026),
*report and recommendation adopted*,
No. 1:25-CV-00940-JLT-EGC, 2026 WL 2032292 (E.D. Cal. July 14, 2026)....6

*Goddard v. Slickdeals, LLC*,
No. 25-CV-06187-JSC, 2025 WL 2969722 (N.D. Cal. Oct. 21, 2025)....12

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009)....10

*Gray v. Nachurs Alpine Sols*., LLC,
No. 3:21-CV-125, 2023 WL 3004433 (N.D. Ohio Apr. 19, 2023)....6

*Harrington v. Choicepoint Inc.*,
No. CV 05-01294 MRP, 2006 WL 8198397 (C.D. Cal., Nov. 8, 2006)....14, 15

*Hodge v. Texaco, Inc.*, 975 F.2d (5th Cir. 1992).... *passim*

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)....25

*Larroque v. First Advantage LNS Screening Sols., Inc.*,
No. 15-CV-04684-JSC, 2016 WL 4577257 (N.D. Cal. Sept. 2, 2016)....6

*Lee v. Hertz Corp*., No. 15-CV-04562-BLF, 2016 WL 7034060 (N.D. Cal. Dec. 2, 2016) ....................................... 5

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................... 11

*Magallon v. Robert Half Int'l, Inc.*, No. 6:13-CV-1478-SI, 2024 WL 4182846 (D. Or. Sept. 13, 2024) ....................................... 5, 8, 9

*Marchioli v. Pre-Employ.com, Inc*., No. EDCV162305JGBDTBX, 2017 WL 2130294 (C.D. Cal. Jan. 25, 2017) ....................................... 12

*Meka v. Deloitte LLP*, No. 25 CIV. 3547 (AKH), 2025 WL 3761874 (S.D.N.Y. Dec. 30, 2025) ....................................... 22

*Meyers v. DISA Glob. Sols., Inc.*, No. 1:24-CV-00880, 2025 WL 2743684 (N.D. Ga. May 8, 2025), *report and recommendation adopted*, No. 1:24-CV-00880, 2025 WL 2743746 (N.D. Ga. June 12, 2025) ....................................... 19

*Moran v. The Screening Pros*, LLC, 943 F.3d 1175 (9th Cir. 2019) ....................................... 10

*Pride v. Correa*, 719 F.3d 1130 (9th Cir. 2013) ....................................... 4

*Reynolds v. Hartford Fin. Servs. Grp., Inc*., 435 F.3d 1081 (9th Cir. 2006) ....................................... passim

*Robertson v. Allied Sols., LLC*, 902 F.3d 690 (7th Cir. 2018) ....................................... 6

*Robins v. Spokeo, Inc*., 867 F.3d 1108 9th Cir. 2017) ....................................... 7

*Rome v. Schneider Nat'l Bulk Carriers Inc.*, No. CV H-19-3110, 2020 WL 13420829 (S.D. Tex. Jan. 15, 2020) ....................................... 18

*Runyon v. ClearStar, Inc*., No. 24-CV-01519, 2025 WL 1530582 (E.D.N.Y. May 29, 2025) ....................................... 15, 24

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. (2007) ....................................... 3, 4, 14, 20

*Salazar v. Golden State Warriors*, 124 F.Supp.2d 1155 (N.D. Cal. 2000) ....................................... 19

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022 (9th Cir. 2006) ....................................... 25

*Schumacher v. SC Data Center, Inc*., 33 F.4th 504 (8th Cir. 2022) ....................................... 6

*Skiles v. Tesla, Inc*., 440 F. Supp. 3d 1012 (N.D. Cal. 2020) ....................................... 22

*Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ....................................... 4, 11

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ....................................... 5, 10

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................... 9

*Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092 (9th Cir. 2022) ....................................... 8

*Thole v. U. S. Bank N.A*, 590 U.S. 538 (2020) ....................................... 7

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ....................6

*Warr v. Cent. Garden & Pet Co.*,
No. 20-CV-09405-JST, 2021 WL 6275013 (N.D. Cal. Sept. 21, 2021)....................24

*Warth v. Seldin*, 422 U.S. 490, 500 (1975) ....................9

*Zuniga v. House Foods Am. Corp.*,
No. SACV 22-00372-CJC (JDEX), 2022 WL 22607479 (C.D. Cal. Sept. 6, 2022)....................22

**Statutes**

15 § 1681a(d) ....................12, 13, 21

15 § 1681a(d)(2)(A)(i) ....................3, 16, 17, 18

15 § 1681b(b)(3) .................... passim

15 § 1681c....................2, 8, 10

15 § 1681c(a)(5)....................2

15 § 1681e....................10

15 § 1681i....................8

Cal. Civ. C. § 1786.16(b)(1) ....................23

Cal. Civ. C. § 1786.2(c) ....................23

Cal. Civ. C. § 1786.40....................23, 24

Cal. Civ. C. § 1786.40(a) ....................23

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)....................4

Fed. R. Civ. P. 12(b)(6)....................4, 10

Fed. R. Civ. P. 15(a)(2) ....................25

Fed. R. Civ. P. 56(e)....................11

FTC Staff Opinion Letter to Hinkle (July 9, 1998)....................19

## INTRODUCTION

It is well-established under 15 USC § 1681b(b)(3) of the Fair Credit Reporting Act ("FCRA") that before taking adverse action on the basis of a consumer report, an employer must first provide the applicant with a copy of the report before the job is lost. Consumers have a right to "*notice and the opportunity* to contest erroneous information in a credit report ***before*** the prospective employer takes an adverse action based on such information." *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1175 (9th Cir. 2018) (emphasis added).

Here, Defendant Schultz Industrial Services, Inc. ("Schultz" or "SIS") disclosed the consumer report that caused his denial for the first time on February 13, 2026—almost two and a half years after he had already lost his job. It was attached for the first time as an exhibit to Schultz's previous motion to dismiss. *See also* Defendant's Request for Judicial Notice in Support of Motion to Dismiss Plaintiff's Third Amended Complaint ("RJN"), Exhibit F (ECF 67-1). The report shows:

**Drug Test Employee Status Notification**
*Schultz Industrial Services, Inc.*
P66 Rodeo

**P66 Rodeo**

**Name:** TOBY WILLIAMS **SSN:** [redacted]

**Employee Status:** Inactive
**Consortium:** DCCHA
**Collection Date:** 8/7/2023 2:30:00PM

In course of Willams' application, Schultz required Plaintiff to execute various forms while promising Plaintiff that it will provide him with a copy of his consumer report. *See* RJN, Exhibits A-E. While Schultz provided him with a copy of his clean background check report, it never provided him with the actual report that caused his denial of employment. Id.; Third Amended Complaint ("TAC"), ¶¶ 13, 15, 59.

On its face, this report is clearly erroneous and misleading. It is titled "Drug Test Employee Status Notification" and discloses an "Inactive" status in connection with an "8/7/2023" "Collection

Date." Combined, these disclosures communicate that Plaintiff received an "inactive" status, and the basis for that status is the sample taken on August 7, 2023. Critically, this report *does not mention* what Williams alleges is the actual basis of the inactive designation. TAC, ¶15. No reasonable person reviewing this report would know that the "inactive" status was actually caused by a failed 2016 drug test[1] rather than the 2023 test. Schultz itself did not know that the basis for Plaintiff's "inactive" status was a failed 2016 drug test until Plaintiff filed this lawsuit. Motion, at 11:26-12:2, 13:7-9. Even assuming *arguendo* that the report accurately discloses that Williams failed his 2016 drug test (which it does not), the report is still erroneous because that information is obsolete and reported without proper consent. 15 U.S.C. § 1681c(a)(5); TAC ¶ 18. Had Plaintiff been provided a copy of the report that served as the basis of his denial, he could have changed his status from "inactive" to "active" and saved his job with Schultz. Id., ¶¶ 17-20.

Incredibly, Schultz argues that Plaintiff could have disputed his "inactive" status with DISA because he had DISA's contact information. Not so. Plaintiff had a clean test and a clean background check. Id., ¶¶ 12, 13. Precisely because Schultz did not give him a copy of the actual report reproduced in part above, Williams did not know that the "inactive" status was what caused his job denial. Id., ¶ 15.

Schultz further claims that Williams' "inactive" status report is not a consumer report under the FCRA and that it therefore had no duty to provide him with a copy. Schultz ignores the long-standing guidance that "[w]orkplace drug tests . . . fall within the plain language of this statute" because they "are communications bearing on [a consumer's] personal characteristics which were used to determine his eligibility for employment." *Hodge v. Texaco, Inc.*, 975 F.2d 1093, 1095 (5th Cir. 1992). A copy of the report that Schultz presents says so right on its face: "Drug Test Employee Status Notification." RJN, Exhibit F. Even a simple statement confirming that there is no reportable

[1] The drug test was conducted entirely for another employer. TAC, ¶ 8.

information on a consumer is a "consumer report" because the term is broadly defined. *Reynolds v. Hartford Fin. Servs. Grp., Inc.*, 435 F.3d 1081, 1094 (9th Cir. 2006), *rev'd sub nom.* Safeco Ins. Co. of Am. v. Burr, *551 U.S. 47 (2007) on other grounds*. A report saying that "Drug Test Employee Status Notification" is "inactive" more than meets the broad definition of consumer report.

Schultz then argues that Williams' "inactive" status report is not a consumer report because it is a "report containing information ***solely*** as to transactions or experiences between [Williams] and [DISA]." 15 U.S.C. § 1681a(d)(2)(A)(i) (emphasis added). Nothing in this report refers to any transaction or experience between Williams and DISA. The report cites only to an August 7, 2023 collection conducted by a third-party company. Declaration of Joshua Kim in Support of Plaintiff's Response to Schultz Industrial Services, Inc.'s Motion to Dismiss Plaintiff's Third Amended Complaint ("Kim Decl."), Exhibit 2. DISA was not directly involved in either the collection or testing of the samples used for Plaintiff's 2023 drug test. In fact, even the "inactive" status is not based on DISA's transaction or experience with Plaintiff. In an email dated November 14, 2023, DISA informed Plaintiff that the "inactive" status is a third-party "NASAP" status that can be changed upon seeing a Substance Abuse Professional. Kim Decl., Exhibit 3. Since NASAP is maintained by HASC, the "transaction or experience" exception does not apply.

Schultz's argument against willfulness of its violation also fails. As Schultz admits, it did not know at the time that Williams' "inactive" status was based on what it now argues is "information solely as to transactions or experiences between" Williams and DISA. Motion, at 12:7-10. Retroactive rationale cannot justify its then-decision not to provide a pre-adverse action notice to Williams—let alone its complete lack of relevant policy and procedure to do so for *any* applicant. TAC, ¶ 60. Schultz knew that DISA is a consumer reporting agency that conducts pre-employment background checks and knew that DISA furnished the report. Id., ¶ 7; RJN, Exhibits A-E. Based on the forms that Schultz required Plaintiff to sign, Schultz also knew that Plaintiff was entitled to obtain a copy of his consumer report. Id. Schultz knew to provide Plaintiff with a copy of his clean

criminal history report yet chose to withhold a portion of the DISA report that actually showed the very basis of his job denial. Id.; TAC, ¶¶ 15, 59. This shows awareness of statutory duty and reckless disregard. Id., ¶ 61. By keeping applicants like Williams in the dark on a gamble that their "inactive" status reports are based on information exclusively about their experience with the consortium consumer reporting agency, Schultz runs "a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007). In this class action, a ruling in Schultz's favor that such information is not a consumer report would shield DISA, HASC and consortium employers like Schultz from liability for disseminating and making adverse employment decisions on the basis of inaccurate and obsolete information.

Schultz's motion to dismiss must be denied in its entirety. Alternatively, Plaintiff should be granted leave to amend his complaint with additional or revised allegations.

## LEGAL STANDARD

"Whether [courts] construe Defendants' motion as one under Rule 12(b)(6) or as a facial attack on subject matter jurisdiction under Rule 12(b)(1), all factual allegations in [the plaintiff's] complaint are taken as true and all reasonable inferences are drawn in his favor." *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

"The *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017) (*citing Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (courts "relax pleading requirements where the relevant facts are known only to the defendant").

## ARGUMENT

### A. Williams Sufficiently Alleged Concrete Injuries to Establish Article III Standing.

Williams alleged in his TAC that he "was deprived of a timely and meaningful opportunity to dispute and correct misleading and obsolete information before the adverse action was taken *and* lost the employment he had already secured." TAC, ¶ 20 (emphasis added). This is sufficient to meet Article III standards. *See Magallon v. Robert Half Int'l, Inc.,* No. 6:13-CV-1478-SI, 2024 WL 4182846, at *9 (D. Or. Sept. 13, 2024) (explaining the consumer interest in "timely receipt of the information contained in the consumer report" necessary for the consumer's "decision-making").

For Williams' employment interests, Schultz's argument boils down to the claim that Williams' "inactive" status was accurate and that he would not have been successful in disputing it. Motion, at 11:23-26, 12:23-13:6. Williams claims otherwise. TAC, ¶¶ 17-18. Between the two, the Court must accept as true allegations made by Williams as long as they are plausible. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

#### 1. Schultz misstates Williams' Article III injuries.

As an initial matter, Schultz cites a number of cases for the proposition that Article III standing requires specific allegations of inaccuracy and of downstream consequences to employment. *See* Motion, at 10:6-11:2, citing *Lee v. Hertz Corp*., No. 15-CV-04562-BLF, 2016 WL 7034060, at *6 (N.D. Cal. Dec. 2, 2016) (finding no standing because "neither Plaintiff alleges that the information on which [the prospective employer] relied was inaccurate or that timely receipt of pre-adverse action packages would have allowed them to successfully contest [the prospective employer's] decision)"; *Campbell v. Adecco USA, Inc*., No. 2:16-CV-04059-NKL, 2017 WL 1476152, at *3 (W.D. Mo. Apr. 24, 2017) (same); *Gray v. Nachurs Alpine Sols*., LLC, No. 3:21-

CV-125, 2023 WL 3004433, at *5 (N.D. Ohio Apr. 19, 2023) (same).[2] These cases are not relevant for the simple reason that Williams *did* make specific allegation of inaccuracy and of downstream employment consequences cause by information deficit. TAC, ¶¶ 17-20. The Supreme Court case cited by Schultz, in fact, recognizes that an allegation that "information deficit hindered [the plaintiff's] ability to correct erroneous information before it was later sent to third parties" is such "downstream consequence" sufficient to find a concrete injury under the FCRA. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021). That is precisely what Schultz alleges.

Schultz further claims that Williams "was not harmed by the alleged inability to communicate *with Schultz* to present additional information or explanations regarding the basis for the 'inactive status.'" Motion, at 12:3-5 (emphasis added). That is not the harm Williams alleged. He alleged a lost opportunity to communicate with *the consumer reporting agency*, not with Schultz. TAC, ¶ 17 (alleging that, if he received the required notice, he would have disputed the obsolete and impermissible information with "Defendant DISA and/or Defendant HASC"); *but compare Schumacher v. SC Data Center, Inc.*, 33 F.4th 504, 511-512 (8th Cir. 2022) (finding lack of Article III standing when the plaintiff did not allege any inaccuracy in her report because the FCRA did not give her a right to dispute accurate reports with her prospective employer) *with Robertson v. Allied Sols., LLC*, 902 F.3d 690, 697 (7th Cir. 2018) (finding that lack of notice injured the plaintiff's interest in responding to her prospective employer and deprived her "of a chance to obtain a benefit" for Article III purposes).

---

[2] Schultz also cites to *Larroque v. First Advantage LNS Screening Sols., Inc*., No. 15-CV-04684-JSC, 2016 WL 4577257, at *5 (N.D. Cal. Sept. 2, 2016) and *Flores v. Missouri Higher Educ. Auth*., No. 1:25-CV-940-JLT-EGC, 2026 WL 1622878, at *2-3 (E.D. Cal. June 5, 2026), *report and recommendation adopted*, No. 1:25-CV-00940-JLT-EGC, 2026 WL 2032292 (E.D. Cal. July 14, 2026). Neither case is relevant to Williams' standing. Larroque had identified injury to her privacy interests, but she had already consented to disclosure. *Larroque*, at *5. Flores only alleged inaccuracies that did not affect her in any material way. *Flores*, at *5. Here, there is no evidence, let alone allegation, that Williams consented to the disclosure of his 2016 drug test results. Williams also specifically alleges material consequences flowing from the identified inaccuracy.

Schultz also claims, introducing a number of exhibits, that Williams "had the ability to contact DISA utilizing the address, website information, and telephone number Schultz repeatedly provided to him in the disclosures he signed when applying for employment." Motion, at 12:17-19. Schultz confuses ability with motivation. Williams' injury stems from not knowing why he was denied employment, i.e. that Schultz denied him because of his "inactive" status. TAC, ¶¶ 15, 17. His "ability" to contact DISA was never an issue. At the time of the denial, as far as Williams knew, he was denied employment for no reason. He had passed the drug test as required by Schultz. TAC, ¶12. DISA's criminal history background check came back clean as well. Id., ¶13. Without a copy of the actual report that served as the basis of Schultz decision, Williams did not know the relevance of DISA's contact information or a reason to use it.

Moreover, it is not only his loss of employment with Schultz but the loss of timely opportunity to remedy his "inactive" status that establishes his injury for Article III purposes. TAC, ¶ 20 (alleging that Williams "was deprived of a timely and meaningful opportunity to dispute and correct misleading and obsolete information before the adverse action was taken and lost the employment he had already secured"). Either injury is sufficient to show that Williams claims more than "a bare procedural violation" and an actual harm. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), *as revised* (May 24, 2016); *Thole v. U. S. Bank N.A*, 590 U.S. 538, 544 (2020).

**2. Loss of an opportunity to timely dispute his "inactive" status with DISA and/or HASC is a concrete injury.**

To evaluate a concrete Article III injury for violation of a procedural right, courts ask "(1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in the case actually harm, or present a material risk of harm to, such interests." *Dutta*, *supra*, 895 F.3d at 1174 (*quoting Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017)).

The court in *Magallon v. Robert Half Int'l, Inc.* identified Article III interests protected by Section 1681b(b)(3) claims beyond lost employment opportunities. No. 6:13-CV-1478-SI, 2024 WL 4182846 (D. Or. Sept. 13, 2024). After surveying a number of relevant cases, including the Ninth Circuit opinion in *Tailford v. Experian Info. Sols., Inc*., 26 F.4th 1092 (9th Cir. 2022), the *Magallon* court identified that the FCRA "was established to protect . . . the concrete interests of, among others, accuracy, relevancy, proper use, and fairness in the reporting of consumer information. Moreover, § 1681b(b)(3) is not limited to situations with inaccurate reports; its required disclosure serves to protect these concrete interests in ensuring the fairness and proper use of credit reporting." *Id*. at *8. The court next found that class members there had shown concrete injury to such interests because, "without timely receipt of the information contained in the consumer report, a consumer (or prospective employee) lacks important information for decision-making." *Id*., at *9. The court explained that, "[e]ven if all the information in a consumer report were accurate, and a class member were ineligible for a position, the lack of timely disclosure before an adverse action delays that applicant from searching for alternate employment or *otherwise from trying to remedy the ineligibility*." *Id*. (emphasis added). The court explicitly distinguished *Dutta*, noting that "Magallon asserts a different injury than not being hired [alleged by Dutta]: the inability to make a timely informed decision due to [the prospective employer's] internal review period." *Id*., at *8, n.6.

Here, Williams alleges that, if Schultz complied with Section 1681b(b)(3), he would have learned the basis of its employment denial and his "inactive" status. TAC, ¶ 17. He identifies a number of options available that could have plausibly led to a change in his status, including a FCRA reinvestigation process under 15 U.S.C. § 1681i for reporting misleading information; violation of 15 U.S.C. § 1681c for disclosure of obsolete information; violation of his 2016 consent for use of his drug test information; or an independent procedure by DISA to restore his status. Id., ¶ 18. He specifically identified that he "was deprived of a timely and meaningful opportunity to dispute and correct misleading and obsolete information before the adverse action was taken." Id.,

¶ 20. Regardless of whether Williams' "inactive" status was accurate or erroneous, these allegations are sufficient to establish injury to his "concrete interests in ensuring the fairness and proper use of credit reporting." *Magallon*, No. 6:13-CV-1478-SI, 2024 WL 4182846, at *9.

As noted by the *Magallon* court, this interest in "ensuring the fairness and proper use of credit reporting" is distinct from employment interest for Article III purposes. Because Schultz denies that his employment interest was injured, Williams addresses it next.

**3. Williams' allegations about injury to his employment interest satisfy the evidentiary burden at the pleading stage.**

Williams alleges that he "lost the employment he had already secured" because of Schultz's "failure to provide the notices required by law before taking adverse action." TAC, ¶ 20. Schultz challenges that allegation, arguing that his "inactive" status was "accurate" under DISA's "own criteria" and could not have been changed. Motion, at 11:19-26, 12:23-13:6. Whether the status was inaccurate and based on obsolete information, however, goes to the merits of Williams' first and second causes of action.

For standing purposes, the Court "accept[s] as valid the merits of [the plaintiff's] legal claims." *Fed. Election Comm'n v. Ted Cruz for Senate,* 596 U.S. 289, 298 (2022) (*citing Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff 's contention that particular conduct is illegal")). "Thus, at the standing phase, when the parties dispute the correct construction of a statute—e.g. one arguing that it applies and the other asserting it does not—and that dispute goes to the merits of the plaintiff's claim, we accept the plaintiff's construction so long as it is arguable." *Am. Encore v. Fontes*, 152 F.4th 1097, 1110-11 (9th Cir. 2025); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) (identifying an exception when "the claim clearly appears to be immaterial, wholly insubstantial and frivolous . . ."). This is consistent with the long-standing rule that, "if there are two alternative explanations, one advanced by defendant

and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, *supra*, 652 F.3d at 1216.

Williams's first cause of action against DISA and/or HASC alleges that his "inactive" status was inaccurate because it misleadingly disclosed that he had failed his most recent drug test in violation of 15 U.S.C. § 1681e. TAC, ¶¶ 16, 44-47. His second cause of action, also against DISA and/or HASC, alleges that the status was erroneous because it was based on obsolete information in violation of 15 U.S.C. § 1681c. TAC, ¶¶ 17-18, 48-51. These are "legal claims" that, for standing purposes, the Court must "accept as valid" unless they are clearly "immaterial, wholly insubstantial and frivolous." In fact, Williams' claims are supported by well-established case law. *See, e.g., Moran v. The Screening Pros*, LLC, 943 F.3d 1175 (9th Cir. 2019) (15 U.S.C. § 1681c); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (15 U.S.C. § 1681e). They are material, substantial, and non-frivolous. Therefore, the Court should accept as true that his "inactive" status is inaccurate and based on obsolete information under the FCRA for standing purposes.

The same is true regarding whether DISA and/or HASC would have changed Williams' inactive status based on any of his challenges, including that his 2016 consent for DISA and HASC to share his drug test results had expired before 2023 and that DISA maintained an independent procedure to restore his status. TAC, ¶¶ 17-18; Kim Decl., ¶ 6 (DISA's website identifying a "Return to Duty" procedure for an employee with "a viewable Inactive Status"); Kim Decl., Exhibit 3 (an email from DISA that "the only way to get [the status] active again is to go see the Substance Abuse Professional then test back into the DCCHA policy").

Schultz argues that Williams' allegations are "speculative" and "not supported by any alleged fact or appended documents." Motion, at 12:23-13:5. At the pleading stage, Williams is not required to prove, or append documentary evidence for, his 2016 consent for DISA and HASC to share his test results or DISA's procedure to reverse his status. *See Berk v. Choy*, 607 U.S. 187, 193

(2026) (holding that Rule 8 establishes "with unmistakable clarity" that "evidence of the claim is *not* required" to defeat a Rule 12 motion). The only requirement here is that "the complaint's factual allegations, if taken as true, 'state a claim to relief that is plausible on its face.'" *Id*. (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleading requirements are also relaxed, and allegations on information and belief are allowed, when facts are known only to the defendants as here. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). Without knowing all the information available only to DISA and HASC, Williams' allegation is plausible that, if made aware of its violations, DISA and/or HASC would have removed all inaccurate, obsolete, and impermissible information from affecting his status. Williams has sufficiently met his burden for plausibility.

Finally, it should be noted that the present case materially differs from *Dutta* for the simple reason that it is currently at the pleading stage. The evidentiary burden to prove standing changes along with "the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id*.

In *Dutta*, the Court evaluated the plaintiff's Article III injury at the summary judgment stage. *Dutta*, 895 F.3d at 1169. The plaintiff there claimed that the charge-off date should have been reported as 2010, not 2014. *Id*., at 1176. The Court noted, however, that "there is not a whisper of challenge by [the plaintiff] *in the record*" as to the alleged inaccuracy. *Id*. (emphasis). In fact, the plaintiff failed to challenge the lender's legal right to determine the charge-off date as 2014. *Id*., at

1176, n.6. Based on undisputed evidence, at a summary judgment motion stage, the Court could only conclude that "the charged-off debt was, indeed, properly dated and accurately reported." *Id*.

Williams is not yet required to prove his standing with evidence except to allege it with requisite plausibility. He did. Williams has Article III standing.

**B. The "Inactive" Status Is A Consumer Report.**

Schultz also moves to dismiss Williams' claim that Schultz violates its duty under Section 1681b(b)(3) for failure to provide a notice and a copy of his consumer report prior to taking adverse action on the basis of the report for employment purposes. Schultz does not dispute that it used his "inactive" status for employment purposes[3] and that it was furnished by DISA and/or HASC, consumer reporting agencies. TAC, ¶¶ 1-2, 14.

Schultz's argument is that the "inactive" status is not a consumer report because, standing alone, it says nothing about Williams' "character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Schultz's narrow interpretation of what constitutes "consumer report" is inconsistent with the courts' broad interpretation. Courts look beyond the literal words of a report to decipher whether it relates to consumer information. They consider the context. Without a context, the phrase "inactive status" has no meaning. If it has no meaning, however, an employer like Schultz has no need for the report, let alone a reason to make employment decisions on its basis. Of course, there is a context for the report, and it is clearly visible on its face:

[3] Schultz cites *Goddard v. Slickdeals, LLC*, No. 25-CV-06187-JSC, 2025 WL 2969722 (N.D. Cal. Oct. 21, 2025) and *Marchioli v. Pre-Employ.com, Inc*., No. EDCV162305JGBDTBX, 2017 WL 2130294 (C.D. Cal. Jan. 25, 2017) for the proposition that Williams did not allege that Schultz denied him employment on the basis of a consumer report. The cites cases are inapposite. Williams specifically alleged that Schultz denied him employment on the basis of the "inactive" status. TAC, ¶ 14. Schultz also relies on *Skiles v. Tesla, Inc*., but the plaintiff there failed to allege the permissible purpose. 440 F. Supp. 3d 1012, 1017 (N.D. Cal. 2020). Williams alleged employment purpose, i.e. that his report was used to deny him employment. TAC, ¶ 14. "Inactive" status, in fact, is routinely used for this exact employment purpose. Id., ¶ 7.

**Drug Test Employee Status Notification**

*Schultz Industrial Services, Inc.*

P66 Rodeo

**P66 Rodeo**

**Name:** TOBY WILLIAMS **SSN:** [redacted]

**Employee Status:** Inactive

**Consortium:** DCCHA

**Collection Date:** 8/7/2023 2:30:00PM

RJN, Exhibit F. Right on the top, the report says it is "Drug Test Employee Status Notification." It lets the user know that a sample was collected on August 7, 2023 at 2:30pm. Finally, the report says that "Employee Status" is "inactive." See also TAC, ¶ 5 (alleging that DISA and HASC store drug test results as "active" or "inactive" status "along with the date of the applicant's most recent drug test"). There is sufficient context here to give meaning to the word "inactive": Williams did not test negative for the test collected on August 7, 2023.

Schultz was a member of consortiums that share applicants' drug test results. TAC, ¶¶ 4, 11, 14. Given the purpose and policy of this drug-test consortium, the meaning of "inactive" is also clear. "Inactive" status communicates that the applicant who previously applied for employment with a consortium member did not test "negative"—that the result was problematic under relevant consortium standards. Id., ¶¶ 5-7, 14.

The "inactive" status report communicates information about the consortium's evaluation of his drug test history and, as such, bears on Williams's personal characteristics, character, or general reputation.

**1. "Inactive" status means Williams has a negative drug test history.**

Schultz argues that the "inactive" status, appearing in connection with a job applicant's drug test, has no bearing on the applicant's "character, general reputation, personal characteristics, or mode of living" under 15 U.S.C. § 1681a(d). The definition of "consumer report" is not so narrow

that courts ignore the context of the report when analyzing whether it has any bearing on consumer information.

The Ninth Circuit faced a similar argument in *Reynolds v. Hartford Fin. Servs. Grp*., Inc., 435 F.3d 1081 (9th Cir. 2006), *rev'd sub no Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) *on other grounds*. There, the consumer reporting agency communicated a "no hit" to the defendant, *i.e*. that it lacked sufficient information on the plaintiff to even generate a consumer report. *Id*., at 1093. As a result, the defendant charged the plaintiff with a higher insurance premiums and later argued that the "no hit" communication was not a "consumer report." *Id*., at 1094. The Ninth Circuit rejected the argument, holding that "FCRA's definition of 'consumer report' is broad." *Id*. In the credit application context of the case, information that the consumer reporting agency lacks sufficient information about a consumer "conveys a message regarding the consumer's creditworthiness, standing, and capacity that makes his obtaining of credit far more difficult. Such a report suggests that the consumer cannot show that he pays debts in a timely manner." *Id*.

The district court case cited by Schultz supports Williams' argument that context matters. *Harrington v. Choicepoint Inc*. (C.D. Cal., Nov. 8, 2006, No. CV 05-01294 MRP) 2006 WL 8198397. There, the plaintiffs argued that internet-based data search products maintained by the defendant consumer reporting agency were consumer reports. *Id*., at *1. The context there was quite limited and unusual, as the plaintiffs' biographical information was disclosed, if at all, to fraudsters. *Id*., at *4 (noting that there is little to no evidence that any information about the plaintiff was even transmitted). Quite literally, the plaintiffs' biographical information, such as social security number, was reported (if at all) *without* a meaningful context. Id., at *2. As such, it had no bearing on any of the consumer information that defines a consumer report. Id., at *5.

A New York district court case completes the other half of the picture, demonstrating that biographical information can become regulated consumer information when disclosed in a different context. In *Runyon v. ClearStar, Inc*., No. 24-CV-01519, 2025 WL 1530582, at *5 (E.D.N.Y. May

29, 2025), the defendant reported on an employment background check report the plaintiff's social security number and a disclaimer that the number was issued prior to the plaintiff's date of birth. The court found that the disclaimer, accompanied by a red flag, constituted a consumer report because they "connote that Plaintiff's SSN does not actually belong to her and suggest that she has done something improper that impugns her moral character, which clearly bears on Plaintiff's character, reputation, and mode of living." *Id*.

The FCRA does not ask whether Williams' "inactive" status, standing alone, has a bearing on his character, reputation, or mode of living. If so, the "no hit" in *Reynolds* and a disclaimer in *Runyon* would not have been a consumer report. *Harrington* merely shows that, when it truly stands alone without any context, the same information is not a consumer report. Accordingly, courts examine the context of the reported information when evaluating whether a report is a consumer report. When disclosed in the context of a credit application, "no hit" implies lack of credit worthiness. When disclosed in the context of employment, a social security number issued before the applicant's birth suggests impropriety in her moral character.

Similarly, when disclosed in the context of a consortium that shares drug test history and on a report titled "Drug Test Employee Status Notification" explicitly identifying a collection date, "inactive" status suggests that the applicant failed a test, potentially up to and including current drug use. As such, it is clearly relevant to his character, reputation, and mode of living, and the "Drug Test Employee Status Notification" report is a consumer report. *See Hodge v. Texaco, Inc*., 975 F.2d 1093, 1095 (5th Cir. 1992) (holding that "[w]orkplace drug tests . . . fall within the plain language of this statute. The reports of the results of these drug tests are communications bearing on Hodge's personal characteristics which were used to determine his eligibility for employment.")

As an aside, Schultz's reference to DISA's website allegedly providing "a list of reasons why an employee's status may change to "inactive" after he or she completes a drug test" appears to be a mistake. Motion, at 15:5-14. The page refers to a wholly different status called "inactive

*retest*," not "inactive." Neither refusal to take the test or a positive result appears in the list of potential reasons for this "inactive retest" status. *See* DISAWorks Help Center: Why did my employee's status change to "Inactive Retest" after completing a random test?, *located at* https://disa.com/contact/works/why-did-my-employees-status-change-to-inactive-retest-after-completing-a-random-test (last visited August 11, 2026). It simply appears to be a flag to the potential employer that the employee must take another test because the previous one had a problem not due to the employee. As such, this supposed list only further supports the conclusion that "inactive" status *doe*s communicate information bearing on the applicant's character information.

**2. The "inactive" status report does not contain any information about transactions or experiences between Williams and DISA.**

Schultz also relies on *Hodge* to argue that Williams' "inactive" status is not a consumer report, because it is a "report containing information solely as to transactions or experiences between the consumer and the person making the report" under 15 U.S.C. § 1681a(d)(2)(A)(i). Schultz invokes the exception as DISA reporting its own "first-hand experiences with Williams" because his "inactive" status is based on his 2016 refusal to take a drug test administered by DISA. Motion, at 17:11-17.

Schultz's own exhibit shows that the exception does not apply. The report by DISA does not contain any information that Williams refused to take a drug test in 2016, the event that Schultz points to as DISA's firsthand experience with Williams. RJN, Exhibit F. That information comes from Williams' allegations in the complaint, not from the report. TAC, ¶¶ 8, 15. In fact, Schultz admits that it did not even know of his 2016 refusal until this litigation was filed. Motion, at 12:7-10. The report itself does not contain any information about DISA's firsthand experience with Williams.

In fact, the DISA report contains information that can only have come from "transactions or experiences" between Williams and a third party. RJN, Exhibit F. Williams was tested on August

7, 2023. TAC, ¶ 12; Kim Decl., Exhibit 2 (specifying "Specimen Collected Date" of "8/7/2023 2:30:00PM" by "Care OnSite/Tango & Co." located in Martinez, CA; "Lab Release Date" of "8/8/2023 5:38:00PM" by "Clinical Reference Laboratory (CRL)" located in Lenexa, KS; a review by "Medical Review Officer" "Richard Weinstein, MD" in Philadelphia, PA; and "Electronic Release Date" of "8/8/2023 6:21:52PM"). The DISA report discloses "Collection Date" of "8/7/2023 2:30:00PM"—identical to the date of sample collection by Care OnSite/Tango & Co. RJN, Exhibit F; Kim Decl., Exhibit 2. On the bottom of the page, it also displays the "Report Date" of "8/8/2023 6:21:56PM"—nearly identical to the "Electronic Release Date" of the test result. RJN, Exhibit F; Kim Decl., Exhibit 2. It also discloses that Williams' "Employee Status" is "Inactive," next to the collection date that predates the report by only a day. RJN, Exhibit F. This disclosure communicates, albeit inaccurately, that Williams did not test clean on his most recent drug test taken the previous day. TAC, ¶¶ 16, 45.

DISA, however, did not collect Williams' sample. Care OnSite/Tango & Co. did. DISA did not test it. Clinical Reference Laboratory (CRL) did. DISA did not review it either. Dr. Richard Weinstein did.[4] None of these pieces of information come from DISA's firsthand experience with Williams. The report clearly does not contain "information solely as to transactions or experiences between [Williams] and [DISA]." 15 U.S.C. § 1681a(d)(2)(A)(i).

It should be noted that Williams also alleged the existence of another report, not by DISA, but by HASC. TAC, ¶ 14 (alleging "Defendant DISA and/or Defendant HASC provided information to Defendant SIS that Plaintiff was 'inactive'"); *see also* Kim Decl., Exhibit 3 (an email from DISA stating that Williams' 2016 test "made [his] NASAP status inactive"). The information reported to

[4] To the extent the Court believes the TAC does not state this point with sufficient clarity, Williams can readily amend to allege explicitly that the laboratory testing associated with the August 7, 2023 collection was performed by a third-party testing provider.

Schultz, on this or another yet-unknown report alleged by Williams, came from the North American Substance Abuse Program ("NASAP") separately maintained by HASC. TAC, ¶ 4.

*Hodge* applied the "transactions or experiences" exception to two (2) separate reports, finding it applicable to one but not the other. The report at issue here is factually analogous to the second report to which the Fifth Circuit did not apply the exception.[5] The second report in *Hodge* was prepared and furnished by an individual doctor, who "sent Hodge's urine specimen to [a third-party test lab] for testing and reported [the lab's] test results along with his own test results." *Hodge*, *supra*, 975 F.2d at 1097. Because the doctor's report incorporated information obtained from a third party, it did not contain information "solely" about transactions or experiences between the consumer and the person making the report.

Similarly, the DISA's "Drug Test Employee Status Notification" report incorporates information obtained from third parties, Care OnSite/Tango & Co. and Clinical Reference Laboratory. RJN, Exhibit F; Kim Decl., Exhibit 2. As alleged, Williams' "inactive" status on the report might be information obtained from HASC, reflecting a transaction between HASC and DISA, not Williams and DISA. Kim Decl., Exhibit 3. If, as alleged by Williams, there exists yet another report from HASC, Schultz cannot claim that any information contained in that report is exempt, because DISA is not "the person making the report." 15 U.S.C. § 1681a(d)(2)(A)(i).

Unremarkably, the cases cited by Schultz do not say otherwise, as they involve reports based on the reporting party's first-hand experience alone. In *Rome v. Schneider Nat'l Bulk Carriers Inc.*, No. CV H-19-3110, 2020 WL 13420829, at *2 (S.D. Tex. Jan. 15, 2020), the defendant employer and its employee collected, tested, received, and reviewed the plaintiff's drug test result. No

[5] The *Hodge* court ultimately found the second report not to be a "consumer report" as well because the plaintiff could not demonstrate that the doctor who prepared the report was a "consumer reporting agency." *Id*. Schultz does not contend that DISA is not a consumer reporting agency, so the *Hodge* court's holding here does not apply. Its reasoning does.

allegation was made that the record incorporated information from a third party. In *Meyers v. DISA Glob. Sols., Inc.*, No. 1:24-CV-00880, 2025 WL 2743684, at *6 (N.D. Ga. May 8, 2025), *report and recommendation adopted*, No. 1:24-CV-00880, 2025 WL 2743746 (N.D. Ga. June 12, 2025), the plaintiff brought a claim directly against a drug testing lab whose report fell within the exception because it was based entirely on the lab's firsthand experience testing the plaintiff's sample. Each involved a report derived from the reporting/testing entity's own first-hand testing experience, without an allegation that the report incorporated substantive information obtained from an outside source.

In *Salazar v. Golden State Warriors*, 124 F.Supp.2d 1155, 1157 (N.D. Cal. 2000), the defendant employer hired a private investigator, who provided the employer with a report summarizing its surveillance of the plaintiff. The court found that the report fell within the "transactions or experiences" exception because it was "a first-hand account of the experience the investigators had with the plaintiff." *Id.*, at 1161. Although the plaintiff argued that certain information, such as the list of registered owners of automobiles encountered by the investigators and a criminal history background check that they performed on him—constituted second-hand information, the court found them immaterial because the list of vehicle owners had no bearing on the plaintiff and the criminal history was not furnished to the defendant employer. *Id*. Here, the information that Williams had taken a drug test the previous day and was evaluated under consortium standards as "inactive," was not only reported to Schultz, the prospective employer, but bore directly on him.

As acknowledged by the *Salazar* court, "if the CRA receives first-hand information from a prior employer, the report from the prior employer to the CRA falls within the exception, while the report from the CRA to *the future employer based on that same information does not*." *Salazar*, *supra*, 124 F.Supp.2d at 1160 (emphasis added); *see also* FTC Staff Opinion Letter to Hinkle (July 9, 1998), attached as Exhibit 4 to Kim Decl. Here, the entire policy and procedure of DISA and

HASC consortiums are to obtain drug test results from a "prior employer" to share it with a "future" one as an instant eligibility status code. TAC, ¶¶ 5-7. This recycling of consumer information does not convert what is otherwise a consumer report into a non-consumer report, and employers like Schultz cannot escape their duty under the FCRA to inform applicants of the basis of adverse action before taking such adverse action based on that report.

**C. Schultz's Disregard Of The Near-Certain Possibility Of Violating The Law Is Willful.**

Schultz argues that Williams failed to allege a willful violation of Section 1681b(b)(3) because he alleged only lack of policy or procedure as the basis for finding willfulness. Motion, at 18:11-14. Schultz ignores Williams' allegation about its mental state that it "should have known" the statutory requirement to provide a copy of the status report prior to taking adverse action. TAC, ¶ 61.

The Supreme Court clarified the willfulness standard in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). A defendant is in willful, or reckless, violation of the statute if its action "shows that [the defendant] ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*., at 69. Its reading is "merely careless," and not reckless, if the relevant statutory text is less than pellucid and there is lack of relevant appellate court opinions or "authoritative guidance" from the enforcement agency. *Id*.

First, it should be noted that Schultz cannot rely on the "transactions or experiences" exception to justify its complete lack of Section 1681b(b)(3) policy and procedure. As admitted by Schultz, at the time it used Williams' "inactive" status to deny him employment, Schultz was not even aware that his status was based on his 2016 refusal to take a drug test, let alone that the "transactions or experiences" exception might apply to the report's underlying information. Motion, at 12:7-10 (claiming that it had no information about the "inactive" status until the filing of Williams' complaint); *see also* TAC, ¶ 5 (only alleging that information available to consortium members includes the active/inactive status and "the date of the applicant's most recent drug test").

In other words, this exception cannot be a "careless reading" of the FCRA that justifies its decision not to have any policy or procedure to provide a copy of the status report prior to adverse action. Id., ¶ 60. It is not even a reading but a retroactive argument.

Even if we give Schultz the benefit of the doubt, it is all but certain that its decision not to implement any policy or procedure will result in violation of Section 1681b(b)(3), because not all past results would be information "solely" about transaction or experience between an applicant and DISA or HASC. After all, under the appellate opinion of *Hodge*, the exception does not apply if underlying tests were performed by a third-party drug lab. As a member of the consortium, Schultz knew that DISA's status determinations are derived from drug-testing information collected from multiple consortium members and testing laboratories. TAC, ¶5. At the time it takes an adverse action, Schultz has no information or reason to believe that the "transactions or experiences" exception applies to a particular applicant's "inactive" status. It knew only that the applicant had a negative drug history with another consortium member, not who performed the test and for whom. Its decision not to provide a notice to any applicant in the absence of any clarifying information is therefore reckless. It all but guarantees that Schultz would end up violating the statutory rights of applicants under Section 1681b(b)(3), unless it later turns out, purely by chance, that their past tests were performed exclusively by DISA and for Schultz.

What remains is Schultz's argument that "inactive" status is not a consumer report because it does not bear on an applicant's "character, general reputation, personal characteristics, or mode of living" under 15 U.S.C. § 1681a(d). However, *Reynolds* warns it away from its narrow interpretation of "inactive" status as a free-standing report without a context. *Reynolds*, *supra*, 435 F.3d, at 1094. *Hodge* warns Schultz that, without the "transactions or experiences" exception, "[w]orkplace drug tests such as those performed by [third parties] fall within the plain language of this statute." *Hodge*, *supra*, 975 F.2d at 1095. Schultz offers no appellate opinions to counter the clear guidance from these cases that, even when reduced to a single status entry, an applicant's drug

history report is a consumer report under the FCRA. And, by ignoring them, Schultz displayed a reckless disregard for its statutory duty under Section 1681b(b)(3).

Schultz cites a number of cases to argue that Williams failed to make sufficient allegations of willfulness. Not so. Unlike the plaintiffs in *Allen* and *Meka*, Williams specifically alleged Schultz's mental state that it knew, or should have known, it had a duty to provide a copy of "inactive" status prior to adverse action. TAC, ¶ 61. *Cf. Allen v. Intuit Inc.*, No. CV 25-7280 PA (PDX), 2026 WL 1459671, at *4 (C.D. Cal. May 21, 2026) (dismissing willfulness claim for failure to allege defendant's mental state); *Meka v. Deloitte LLP*, No. 25 CIV. 3547 (AKH), 2025 WL 3761874, at *2 (S.D.N.Y. Dec. 30, 2025) (same); *Skiles v. Tesla, Inc.*, 440 F. Supp. 3d 1012, 1019 (N.D. Cal. 2020) (dismissing a prayer for willfulness damages with no other allegations in the complaint).

The other cases Schultz cites are similarly inapposite. The court in *Beltran* dismissed the plaintiff's willfulness claim because of a conflicting Ninth Circuit decision and the plaintiff's failure to provide relevant authority. *Beltran v. Waste Mgmt., Inc.*, No. 2:23-CV-00279-DC-CSK, 2025 WL 1455680, at *6 (E.D. Cal. May 21, 2025); *see also Dawson v. Wonderful Pistachios & Almonds*, LLC, No. CV 18-801 PA (JPRX), 2018 WL 5263063, at *6 (C.D. Cal. Apr. 27, 2018). The plaintiff in *Zuniga* made allegations similar to Williams but failed to "connect these allegations to authority showing the objective unreasonableness of [the defendant's] interpretation or otherwise explain why [the defendant's] conduct amounts to reckless disregard of [its] statutory obligations." *Zuniga v. House Foods Am. Corp.*, No. SACV 22-00372-CJC (JDEX), 2022 WL 22607479, at *4 (C.D. Cal. Sept. 6, 2022). Here, Williams connected his allegations to both *Reynolds* and *Hodge* and further explained how Schultz all but guaranteed that its complete lack of policy and procedure would result in a violation of Section 1681b(b)(3).

Schultz had the benefit of guidance and warning as explained by the *Safeco* court. The Ninth Circuit has long held that "FCRA's definition of 'consumer report' is broad." *Reynolds*, *supra*, 435

F.3d at 1094. The Fifth Circuit confirmed that "[w]orkplace drug tests such as those performed by [third parties] fall within the plain language of this statute." *Hodge*, *supra*, 975 F.2d at 1095. Given these appellate opinions, Williams' allegation that Schultz has no policy or procedure to provide a pre-adverse action notice and knew, or should have known, that it was required to, is sufficient to state a willful violation.

### D. "Inactive" Status Is An Investigative Consumer Report That Also Requires Notice Under ICRAA.

Schultz also moves to dismiss Williams' cause of action under Sections 1786.16 and 1786.40 of the California Civil Code. The California statute, also known as the Investigative Consumer Reporting Agencies Act ("ICRAA"), defines "investigative consumer report" as one in which "information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through any means." Cal. Civ. Code § 1786.2(c). *It has no "transactions or experiences" exception.*

ICRAA was "modeled after FCRA and [was] intended to serve complementary, but not identical." *Connor v. First Student, Inc.*, 5 Cal. 5th 1026, 1032 (2018). The complementary nature of ICRAA is evident in its notice requirements. It requires an employer to provide a written form for an applicant to indicate a wish to receive a copy of the report obtained by the employer. Cal. Civ. Code § 1786.16(b)(1). Once that box is checked, the employer must send a copy of the report to the applicant "*within three business days* of the date that the report is provided." *Ibid*. (emphasis added). ICRAA also requires the employer to advise the applicant and "supply the name and address of the investigative consumer reporting agency making the report." Cal. Civ. Code § 1786.40(a).

Williams "indicated on a written form that he wished to receive a copy of his report," but Schultz never provided it, let alone "within three business days of the date" that Schultz received

his "inactive" status. TAC, ¶ 69.[6] Nor did it provide Williams with the name and address of DISA as the investigative consumer reporting agency that provided Schultz with the "inactive" status. TAC, ¶ 71. The remaining question is whether the "inactive" status was an investigative consumer report, thereby triggering Schultz's duties under §§ 1786.16 and 1786.40 to provide a copy to Williams. Schultz argues that it cannot be because Schultz "had no knowledge of the basis for the 'inactive' status until receiving Plaintiff's Complaint." Motion, at 17:24-18:2.

Whether the "inactive" status is information about Williams' "character, general reputation, personal characteristics, or mode of living" is answered affirmatively by *Reynolds*, *Hodge*, and *Runyon*. *See* Part B *supra*; *see also Connor v. First Student, Inc.*, 5 Cal. 5th 1026, 1031 (2018) (recognizing that a report containing information about "drug/alcohol use" is an investigative consumer report). Finally, the only case cited by Schultz says nothing about whether the "inactive" status report constitutes an investigative consumer report under ICRAA. It dismissed the plaintiff's ICRAA claim because he did not allege that the defendant procured *any* report at all. *Warr v. Cent. Garden & Pet Co.*, No. 20-CV-09405-JST, 2021 WL 6275013, at *3 (N.D. Cal. Sept. 21, 2021). Williams alleged that Schultz did. TAC, ¶ 14. Schultz even attached a copy to its motion. RJN, Exhibit F.

Williams has alleged sufficient facts to state Schultz's violation of the notice requirements under ICRAA.

**E. Schultz's Request for Judicial Notice Must Be Denied**

Schultz asks that the Court take judicial notice of several documents and incorporate them into the complaint. (ECF 67-1.) All attached Exhibits, with the exception of "F" should not be judicially noticed, or incorporated, because they are not relevant to resolve Schultz's motion. *See*,

[6] Schultz argues that it "repeatedly provided" Williams with required information about DISA "before it took any adverse action." Motion, at 19:24-20:2. That argument misses the point. It never provided a copy of Williams' "inactive" status to him within "three days" of its receipt.

*e.g.*, *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (declining to take judicial notice of irrelevant documents).

While the TAC refers to his "inactive" status furnished from DISA and/or HASC to Consortium employers such as Schultz, Williams cannot at this time confirm that Exhibit F is *the only* "inactive" status report that Schultz relied upon to deny his employment. Accordingly, Plaintiff objects to Schultz's request for judicial notice of Exhibit F on this basis.

Furthermore, Schultz cannot establish that the TAC referenced any of the Exhibits, let alone "extensively," to incorporate them by reference. As warned by the Ninth Circuit, "[s]ubmitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). If the Court considers Exhibit F for the truth of Schultz's disputed factual characterization, Williams "receives no opportunity to respond to the defendant's new version of the facts." *Id*.[7]

## CONCLUSION

Schultz's motion should be denied in its entirety. In the alternative, Plaintiff respectfully requests that the Court allow him to amend the TAC to show not only that the "inactive" status report constitutes a consumer report under the FCRA and an investigative consumer report under the ICRAA but that Schultz's violation of the notice requirement under 15 U.S.C. § 1681b(b)(3) is willful. Although Williams previously amended his complaint, this Court has not yet ruled on the issues raised by Schultz; Williams is capable of making more specific allegations to support his claims; and leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

---

[7] While Williams cited to Exhibit F above, none of his arguments depends on it to prevail. To the extent that the Court takes its judicial notice and grants Schultz's motion to dismiss, Williams respectfully requests an opportunity to respond by amending his complaint.

DATED: August 11, 2026

DHF LAW, P.C.

By: */s/ Joshua E. Kim*
Devin H. Fok
Joshua E. Kim
Attorneys for Plaintiff
TOBY JOEL WILLIAMS

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 11, 2026, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Northern District of California, using the Court's Electronic Case Filing (ECF) system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2026.

By: /s/ Joshua E. Kim
Joshua E. Kim